AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Missouri

| | |
|---|---|
| **In the Matter of the Search of** ) | |
| ) | |
| **target device #3**, currently in the custody of the St. ) | Case No. 4:20 MJ 6134 PLC |
| Charles County Police Department, within the ) | |
| Eastern District of Missouri, more fully described ) | SUBMITTED TO THE COURT AND |
| and depicted in Attachment A. ) | SIGNED BY RELIABLE ELECTRONIC MEANS |

## APPLICATION FOR A SEARCH WARRANT

I,  __James Gaddy__  , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

**target device #3**, currently in the custody of the St. Charles County Police Department, within the Eastern District of Missouri, more fully described and depicted in Attachment A.

located in the _____ EASTERN _____ District of _____ MISSOURI _____ , there is now concealed

see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
  ✓ evidence of a crime;
  ✓ contraband, fruits of crime, or other items illegally possessed;
  ✓ property designed for use, intended for use, or used in committing a crime;
  ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., §§ 841, 846 | Conspiracy to possess with intent to distribute controlled |
| Title 18, U.S.C. §§ 924(c), 1956, 1957 | substance(s); firearms offenses; money laundering |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

  ✓    Continued on the attached sheet.
  ❑    Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.
  **I state under the penalty of perjury that the foregoing is true and correct.**

_____
*Applicant's signature*
JAMES GADDY, Task Force Officer
DEA
_____
*Printed name and title*

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: _____ June 4, 2020 _____

*Patricia L. Cohen*
_____
*Judge's signature*

City and State: _____ St. Louis, MO _____

Hon. Patricia L. Cohen, U.S. Magistrate Judge
*Printed name and title*
AUSA: John R. Mantovani

## ATTACHMENT A

**Target Device #3,** currently in the custody of the St. Charles County Police Department, within the Eastern District of Missouri, is further described as follows:

**A Multicolored Samsung Model Cellular Device, SM-N975U, IMEI: 359271100750722**



**ATTACHMENT B**

1.      All records on target device #3 that relate to violations of Title 21, United States Code (U.S.C.), Section 841(a)(1); unlawful use of a communication facility, in violation of Title 21, U.S.C., Section 843(b); conspiracy and attempt to possess with intent to distribute and to distribute controlled substance, in violation of Title 21 U.S.C., Section 846; felons in possession of firearms and in possession of firearms in furtherance of drug trafficking crimes in violation of Title 18 U.S.C, Sections 922(g) and 924(c); and laundering of monetary instruments, in violation of Title 18, U.S.C., Sections 1956 and 1957 (hereinafter collectively referred to as the "target offenses") that relate to **Guy GOOLSBY** from May 29, 2019 to May 26, 2020 including:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs, chemicals, and precursors trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of drugs, chemicals, or precursors (including names, addresses, phone numbers, or any other identifying information);

   d. any information related to the dates, times, and locations of the distribution and manufacture of controlled substances or the delivery of items used in the distribution and manufacture of controlled substances;

   e. all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the target devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      All records and other evidence, connection logs, and records of user activity for the target devices, including:

   a. Connection date and time;

   b. Disconnect method and time;

   c. Method of connection (e.g., telnet, ftp, http);

   d. Date transfer volume;

   e. User name associated with connection;

   f. Telephone caller identification records;

   g. Other connection information, such as:

1)   Any and all telephone numbers, addresses, names or contacts associated with the connection;

2)   Any and all data which might be information from a personal calendar or day planner associated with the connection; and

3)   Any and all data regarding wire or electronic communications, i.e., e-mail, text messages, address books, direct connect numbers, photographs or other images, saved messages including voice and draft messages associated with the connection.

As used above, the terms "records," "information," and "data" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4.    things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

James Gaddy, being duly sworn by reliable electronic means, deposes and says as follows:

## INTRODUCTION

1.      I am an investigative and law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been a deputized Task Force Officer with the Drug Enforcement Administration (DEA) since October 2010 and am currently assigned to an Enforcement Group of the St. Louis Division Office. Prior to my DEA assignment, I was a sworn police officer with the St. Charles County Police Department and Breckenridge Hills Police Department for approximately 20 years.

3.      During the course of my law enforcement experience I have participated in numerous investigations involving controlled substances.  I have conducted investigations of a variety of illegal drug-trafficking and money-laundering organizations.  I have participated in investigations which led to the seizure of illegal drugs, weapons, and assets derived from the sale of illegal drugs, and the subsequent felony arrests of those individuals involved.  I have participated in several prior investigations involving Title III authorized wiretaps and have had specialized training from the United States Department of Justice, DEA, regarding telephone data exploitation. I have also participated in numerous drug-related training courses throughout my law enforcement career.  I am familiar with and have used normal methods of investigation, including, but not limited to, visual and electronic surveillance, questioning of witnesses and defendants, the use of

1

search and arrest warrants, the use of informants, the use of pen registers, the utilization of confidential sources and undercover agents, and the use of court-authorized wire intercepts.

**PURPOSE OF AFFIDAVIT**

4.      This Affidavit is submitted in support of an application for the issuance of a search warrant for the electronic device (**target device #3**) contained in ATTACHMENT A (including photographs of **target device #3**), to search for the records and data detailed in ATTACHMENT B, which constitutes evidence of the crimes described herein.  St. Charles County Department of Corrections (SCCDOC) Officer Clamors seized the **target device #3** from **Guy GOOLSBY** ("**GOOLSBY**") (DOB: October 29, 1979; SSN: XXX-XX-1912").  SCCDOC Officer Clamors seized the **target device #3** during a jail search, by St. Charles County Department of Corrections (SCCDOC) personnel as a result of suspicious behavior by **GOOLSBY's** within his assigned Unit (Unit G) at a SCCDOC facility, within St. Charles County and the Eastern District of Missouri on May 26, 2020.

5.      The **target device #3** is currently in the custody of the St. Charles County Police Department, within the Eastern District of Missouri.  **GOOLSBY** is in custody with the United States Marshal Service, and is being held at the St. Charles County Department of Corrections Facility, as set forth below.

6.      It is my opinion as an experienced, trained narcotics investigator that there exists probable cause to believe that the target devices will contain evidence of violations of Title 21, United States Code, Sections 841 and 846 (Possession with Intent to Distribute/Distribution of Controlled Substances and/or Conspiracy). The controlled substances which are the primary focus of this investigation are heroin, a Schedule I controlled substance and fentanyl, a schedule I controlled substance.  In addition, based on the investigation set forth herein, I believe the target

2

devices will also contain evidence of violations of Title 18, United States Code, Sections 924(c) (Possession or Use of a Firearm in Furtherance of a Drug Trafficking Crime), and 1956 and 1957 (money laundering and conspiracy to commit money laundering).

7.      The facts and information set forth in the Affidavit are based upon my personal knowledge obtained during the course of the investigation, information reported to me by other agents and employees of the DEA and other law enforcement agencies, my review of reports, toll analysis, pen register analysis, interception of wire and electronic communications, financial analysis, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of securing a search and seizure warrant in relation to the target devices, it does not include each and every fact known to me concerning this investigation, and sets forth only those facts believed necessary to establish probable cause that violations of Title 21, U.S.C. §§ 841(a)(1), 846, 843(b), 848, 1956 and 1957 have occurred, are occurring, and will occur.

## INVESTIGATION AND PROBABLE CAUSE

8.      Beginning in March 2018, the DEA began an investigation into **Guy GOOLSBY** ("**GOOLSBY**") who was identified as a leader within the St. Louis-based faction of a drug trafficking organization (DTO) that and is responsible for the distribution of hundreds of kilogram quantities of cocaine, heroin and fentanyl throughout the St. Louis Metropolitan area.  This DTO is responsible for the trafficking of cocaine, fentanyl, and heroin from Mexico, through Texas and Florida to the St. Louis area.  Throughout 2018, the DEA utilized drug seizures, money seizures, physical surveillance, consensually recorded telephone conversations, and information derived from telephone conversations intercepted pursuant to Orders of this Court involving **GOOLSBY**,

traffic stops of courier vehicles, and other investigative techniques to gather evidence against **GOOLSBY** and others involved in the this DTO.

### A.  GOOLSBY'S Criminal History.

9.      A review of at least one criminal history database reveals that **GOOLSBY** pleaded guilty to or was convicted of offenses that include the following: 1) On or about September 23, 1998: felony possession of controlled substance, for which **GOOLSBY** was found guilty, received a five year suspended imposition of sentence, and was placed on three years of probation; 2) on or about November 20, 2000: felony possession of a controlled substance, for which **GOOLSBY** was sentenced to five years confinement; 3) on or about October 5, 2008, unlawful possession of a firearm and resisting arrest, for which **GOOLSBY** was found guilty and received a two year suspended sentence, and was placed on two years of probation; 4) on or about July 21, 2009: distribution of crack cocaine (2 counts), for which **GOOLSBY** was found guilty and was sentenced to 120 months confinement in Federal prison; and 5) on or about June 25, 2012: possession with intent to distribute 50 grams of cocaine base, for which **GOOLSBY** was found guilty and sentenced to 120 months confinement in Federal prison.

### B.  GOOLSBY's Drug Trafficking Activities

10.      In March of 2018, I acquired intelligence surrounding a multi-kilogram cocaine and heroin distribution network based in Houston, Texas and the St. Louis Metropolitan area.  During the course of the investigation, my investigative team and I identified **Guy GOOLSBY** (**GOOLSBY**) as a leader within the St. Louis-based faction of the larger Drug Trafficking Organization, responsible for the distribution of hundreds of kilogram quantities of cocaine, heroin, and fentanyl.  Working closely with **GOOLSBY** and the DTO are David FOSTON, Grant BERRY, and other St. Louis based large-scale drug distributors.

4

11.     As the investigation progressed, which resulted in the seizures of 40 kilograms of drugs and approximately $2,000,000 between March and September of 2018, I was able to identify **GOOLSBY**'s, BERRY's and FOSTON's Houston-based source.  That source has since been established as a confidential source (hereinafter referred to as CS-1.)

12.     Based on CS-1 debriefings, physical surveillance, consensual monitoring of cellular phone communications, and other law enforcement means, I am confident **GOOLSBY** utilized multiple sources for the specific type of drug he is seeking to distribute.  He had a source for cocaine, a source for heroin, and a source for fentanyl.

13.     On March 17, 2018, my investigative and I seized $1,304,840.00 in Phelps County, Missouri from O.B DODD, a courier for the DTO.  CS-1 explained to me that this money was a portion of **GOOLSBY**'s, BERRY's, and FOSTON's drug proceeds that derived from their sale of approximately 50 kilograms cocaine in the St. Louis area  The money was being sent to **GOOSLBY**'s, BERRY's, and FOSTON's source of supply in Texas as payment for that 50 kilogram shipment of cocaine.

14.     On April 20, 2018, DEA investigators on my investigative team seized approximately 25 kilograms of cocaine was seized in St. Louis County, Missouri from Mario AQUILAR-Estrada, a courier for the DTO.  The seized kilograms of cocaine were intended for **GOOLSBY**, BERRY, and FOSTON, but were intercepted by law enforcement before the delivery could be completed.  BERRY provided his maroon Ford Explorer as transportation to AGUILAR-Estrada to transport the shipment of cocaine from the tractor-trailer that had delivered to the St. Louis area to **GOOLSBY**, BERRY, and FOSTON.  This was later verified by CS-1 during his/her debriefings in late 2018.

15.     On July 25, 2018, approximately $263,420.00 and approximately three kilograms of fentanyl were seized in Tulsa, Oklahoma from Carlos and Lina MACIAS, couriers for the DTO. The currency was drug proceeds derived from the sale of approximately nine kilograms of fentanyl by **GOOLSBY**, BERRY, and FOSTON.  The MACIASs was returning the money as payment to another source of supply in the Florida area.   The three kilograms of fentanyl seized by investigators were later determined to have been given back to the MACIASs for return to the source by **GOOLSBY**, BERRY, and FOSTON due to the Fentanyl's poor quality.  During his debriefing in late 2018, CS-1 verified this information.

16.     On October 6, 2018, my investigative and I seized approximately $380,000.00 in Cleveland, Texas.  Utilizing CS-1, my team and I arranged a fictitious 25 kilogram cocaine transaction with **GOOLSBY**, BERRY, FOSTON, and Chivas HOLMES.  All parties agreed to collect and provide CS-1 with approximately $380,000.00 in exchange for the fictitious kilograms of cocaine. **GOOLSBY**, BERRY, FOSTON, and HOLMES employed Chivas HOLMES brother, Shannon HOLMES, to transport the currency to the Houston, Texas area in order to procure the 25 kilograms.  Following the exchange of the $380,000.00 for the 25 kilograms of fictitious cocaine, I directed a marked police unit to effect a traffic stop of Shannon HOLMES and recover the fictitious kilograms.  The packages of money that Shannon HOLMES gave to CS-1 in exchange of the fictitious cocaine were wrapped in plastic and each package had the known nickname of **GOOLSBY**, BERRY, and FOSTON, on it to designate who had provided what amount of money.

17.     Cellular devices were used extensively by the members of this DTO throughout the investigation period to acquire and re-distribute large amounts of controlled substances. Specifically, **GOOLSBY** used over twelve cellular devices during a six-month period in late 2018 and early 2019 to conduct his drug trafficking activities.   I know from this investigation, prior

6

Title-Ill investigations, and subsequent de-briefing of involved parties by investigative team members that drug traffickers, including **GOOLSBY**, are known to compartmentalize the use of multiple telephones. As an example, a subject will use a certain telephone to contact sources of supply, another telephone to contact couriers, other telephones to contact underlings, so forth and so on. De-briefing of co-conspirators and captured court authorized wire interceptions have revealed that the above methods are employed to thwart law enforcement's ability to detect members of a drug trafficking organization and conduct electronic surveillance on co-conspirators.

### C.  Confinement of GOOLSBY at St. Charles County Department of Corrections

18.     On May 29, 2019, **GOOLSBY,** BERRY, FOSTON, the MACIASs, Chivas HOLMES, Shannon HOLMES, and others were indicted in United States District Court – Eastern District of Missouri in a fifteen-person conspiracy for his involvement in large scale cocaine, heroin, and fentanyl trafficking from Mexico, through Texas and Florida, to St. Louis under *Untied States v. Guy Goolsby, et al*, 4:19-CR-00412 AGF (PLC.) At the present time, **GOOLSBY** is being held by the United States Marshal Service at the St. Charles County Department of Corrections Facility until his case is fully adjudicated.

19.     Upon his confinement at the SCCDOC, the jail staff fully explained the rules and regulations of the facility to **GOOLSBY**.  One of those rules and regulations is that inmates may not possess or use a personal cellular device in the jail facility.  Under Revised Statutes of Missouri §217.360, it is a class A misdemeanor punishable by up to a year in jail and/or a fine of up to $1000.00 in the State of Missouri for any inmate in any county jail to have in his possession "[a]ny article or item of personal property which an offender is prohibited by law or by rule and regulation of the division from receiving or possessing."

7

**D.  GOOLSBY's Possession and Use of Target Devices #1 and #2**

20.      On October 31, 2019, I was made aware of recently initiated investigation lead by the St. Charles County Police Department (SCCPD) Detective Bureau.  The investigation focused on allegations of cellular devices being smuggled illegally into the jail facility by jail staff and sold to inmates for the inmates' surreptitious use.

21.      SCCPD detectives indicated on or about October 23, 2019, they spoke to a Source of Information (SOI) relating to cellular devices within the jail facility.  The SOI indicated a St. Charles County Corrections Officer (CO) was illegally smuggling cellular devices into the jail facility and was then selling those cellular devices to jail inmates for $3500.00 per device.  The SOI informed SCCPD detectives that **GOOLSBY** was currently in possession of two (2) cellular devices (target devices #1 and #2) which were provided to **GOOSLBY** by the St. Charles County CO.

22.      SCCPD detectives immediately notified jail staff of the accusations.  On or about October 23, 2019, Jail staff requested that **GOOLSBY** exit his solely occupied jail cell and informed **GOOSLBY** he would be escorted to their scan apparatus designed to locate contraband hidden on or in someone's body.  When informed he was being taken to the scanning apparatus, **GOOLSBY** immediately became combative and resisted with jail staff in an attempt to avoid the cellular device being located.  Once **GOOLSBY** was restrained and under control, jail staff was able to locate a cellular device, one of the cellular devices, hidden on **GOOSLBY**'s person.  Jail staff then conducted a cell search of **GOOOSBY**'s cell and located another cellular device, the other cellular device, hidden within **GOOLSBY**'s cell.  Target devices #1 and #2 were seized by jail staff and ultimately relinquished to the custody of SCCPD detectives.  At the time of their

seizure of **GOOLSBY**, both cellular devices were powered on and from an exterior viewing appeared to detectives to operate as designed.

23.     SCCPD detectives attempted to interview **GOOLSBY** concerning the cellular devices, but he refused to speak to detectives.

24.     Once notified of the recovery of target devices #1 and #2, I spoke to SCCPD detectives relative to **GOOLSBY**'s access to communication methods provided.  I was interested in discovering what if any contact **GOOLSBY** could have though approved means to speak to his family and friends.  SCCPD detectives advised that every inmate, and specifically **GOOLSBY**, is provided an IPad by the jail that allows the inmate to video chat with family and friends.  Any videos made by any inmates on the IPad are recorded and maintained by the St. Charles County Department of Corrections.  Further, during all of the video chats, both parties to the chat are informed that their communications can and will be recorded and maintained by the St. Charles County Department of Corrections.  SCCPD detectives reviewed **GOOLSBY**'s recorded video chats and advised **GOOLSBY** has numerous hours of recorded video chats with various family and friends.  This includes videos of communications between **GOOLSBY** and **GOOLSBY**'s paramour, Tiara Booker.  The videos between **GOOLSBY** and Ms. Booker are of a personal, intimate, and sexual nature, and show that **GOOLSBY** is comfortable using authorized and recorded jail communication methods to spend intimate time with his paramour.  Based on the explicit and usually personal nature of his communications with Ms. Booker, it does not appear that **GOOLSBY** would find it necessary to possess private and illegal communication devices, such as target devices #1 and #2, if his sole desire was to privately communicate with Ms. Booker or other friends and family about legal and/or personal subject matters.

9

25.     Based on **GOOLSBY**'s past drug trafficking activities, his resistance to jail personnel when one of the target devices was found on this person, the inferred knowledge that all jail-authorized communication methods are recorded, and his use of those authorized communication devices to communicate in an intimate and personal way with Ms. Booker, investigators are confident that **GOOLSBY**'s possession of unauthorized and private communication devices, i.e. target devices #1 and #2, is solely based on his desire to communicate with others about unauthorized or illegal activities.

26.     On November 1, 2019, the Honorable United States Magistrate Judge Shirley P. Mensah issued a search warrant (4:19 MJ 7451 SPM) for target devices #1 and #2.  Target devices #1 and #2 were relinquished to the St. Louis City Metropolitan Police Department – Cyber Crime Unit to be analyzed.  The data collected from target devices #1 and #2 were reviewed by DEA investigators and immediately noticed **GOOLSBY's** obvious usage of target devices #1 and #2. For example, **GOOLSBY** had numerous sexually explicit "selfies" and/or photographs from himself.  Furthermore, although I discovered limited text messages to and from **GOOLSBY**, I noticed **GOOLSBY** had directed unknown person(s) to conduct spot-surveillance checks of **GOOLSBY's** known paramour and "stash house" operator's house, Tiara BOOKER.[1]  The unknown person apparently would drive-by BOOKER's residence and take photographs of vehicles on her driveway and then report back to **GOOLSBY** with photographs of those vehicles. Moreover, I observed **GOOLSBY**'s sent photographs of the different vehicles, and I believe those photographs were a direct result of **GOOLSBY's** instruction to the photographing individual to conduct surveillance of BOOKER and then report back to **GOOLSBY**.  This is further evident of

---

[1]     I am confident, based on **GOOLSBY's** status within the DTO and his extensive prior jail experience, **GOOLSBY** deleted a majority of his communication conducted on target devices #1 and #2 prior to law enforcement seizing the cellular devices.

**GOOLSBY's** leadership status of the DTO, capable of obtaining cellular devices within a secured jail facility and then direct those outside of jail to perform various task for **GOOLSBY**. To date, I continue to investigate the content collected from target devices #1 and #2.

### E. GOOLSBY's Possession and Use of Target Device #3

27.     On May 26, 2020, I was once again contacted by St. Charles County Police Detectives (SCCPD) relative to **GOOLSBY** being found in possession of another cellular device (**target device #3**).  SCCPD Detectives indicated they responded to the St. Charles County Department of Corrections (SCCDOC) where they were briefed of the incident and seized **target device #3** from jail staff.

28.     SCCPD Detectives advised on May 26, 2020 at approximately 3:35 p.m., SCCDOC officers were letting the inmates housed in Unit G (**GOOLSBY's** housing unit) into the recreational yard. As SCCDOC officers were monitoring the inmates' movement from Unit G to the recreational yard, SCCDOC Officer Clamors observed **GOOLSBY** reaching behind the television which is located in the more common area of Unit G.  SCCDOC Officer Clamors questioned **GOOSLBY** concerning his suspicious actions and **GOOSLBY** indicated he wanted to turn the television on. However, SCCDOC Officer Clamors was aware the controls were on the opposite side of the television where **GOOLSBY** was reaching and further there was no rational reason for turning the television on when the inmates were instructed to vacate Unit G to recreational yard.  The SCCDOC Officer Clamors then directed **GOOLSBY** to depart Unit G and respond to the recreational yard with the rest of his unit.

29.     Once **GOOLSBY** had departed Unit G, SCCDOC Officer Clamors immediately notified the supervisor of **GOOLSBY's** suspicious actions.  Immediately, all available SCCDOC officers responded to Unit G and the mounted television where **GOOLSBY** was reaching behind.

Concealed in a sock and behind the television, Officers Clamors located a cellular device (**target device #3**) plugged into the USB port of the television.[2]  SCCDOC Officer Clamors immediately seized **target device #3** and turned-off / powered-down **target devices #3**.[3]  **Target device #3** was relinquished custody to SCCPD Detective Kevin Knobbe and was secured within SCCPD evidence vault.

30.     Based on their prior knowledge of my on-going investigation involving **GOOLSBY**, SCCDOC officers and/or SCCPD detectives did not question **GOOLSBY** concerning their discovery of **target device #3**.  However, SCCDOC officers monitored recorded jail calls involving **GOOLSBY** following days after the seizure of **target device #3**.  During recorded jail call, on May 27, 2020, **GOOLSBY** contacted a young female child, who I believe is a close relative of **GOOLSBY's** .  Approximately one minute 30 seconds into the call, **GOOLSBY** apologizes to the young child and explained to her he was "in trouble."  The young child replied to **GOOLSBY** stating, "it's your phone (**target device #3**)?"  **GOOLSBY** acknowledged stating, "I know." The child responded, "Your phone (**target device #3**), I told you, you were going to get into trouble."  The conversation continued during which **GOOLSBY** explained he will be in the "hole" (solitary confinement) for three or four months and will miss her birthday.

31.     From training, experience, and the instant investigation, I am aware drug traffickers, especially ones with the high-ranking stature of **GOOLSBY,** maintain some control of their drug trafficking network even while incarcerated.  This is primarily done to avoid losing income, position in the organization, and/or ability to direct and/or control those subordinate within

---

[2]       Through our training and experience and the SCCDOC Officer Clamors observations, SCCDOC officers and I believe **GOOLSBY** place **target device #3** behind the television and plugged **target device #3** into one of the mounted television's USB port in order to charge **target device #3** while in the recreational yard.

[3]       SCCDOC officers immediately powered down **target device #3** due to the capabilities of deleting and/or wiping all data remotely from "Smart" cellular devices, ultimately destroying potential evidence.  Further, it was unknown if **target device #3** was sending or transmitting audio, video or other data from inside Unit G to outside individuals outside of the SCCDOC facility.

the hierarchy.  Based on my monitoring of his cellular communications before he was indicted from Late 2018 to early 2019 before he was indicted, I am confident **GOOLSBY's** continues to oversee or at least monitor his DTO through the use of fear and intimidation.  With **GOOLSBY's** continued responsibility as a leader, **GOOLSBY** must have the capacity to maintain consistent communication with those outside of the correctional facility.  This necessity requires **GOOLSBY** to utilize smuggled cellular devices such as target telephones #1 and #2 and now **target device #3**.

### F.  Background on Electronic Media.

32.     Based on my training and experience, as well as discussions I have had with other trained agents and investigators, I know that mobile telephones contain a variety of stored electronic data.  For example, mobile phones maintain call logs that record the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, mobile telephones often referred to as "smart phones" offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet, including applications or "apps," such as social media apps, including Facebook.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

33.     Digital cameras, like those seized in this investigation record pictures digitally, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.

Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

34.     The development of computers, digital cameras, mobile telephones and the Internet has changed the way in which individuals involved in illegal drug distribution conspiracies, and related activities, such as firearms offenses and violence, interact with one another.  Computers and electronic storage devices such as cameras, tablets, and mobile phones serve various functions in connection with illegal drug distribution conspiracies, and related activities, such as firearms offenses and violence.  They include: (1) the ability for criminal associates to communicate with one another and with other conspirators via, mobile phones and voice call, text, or email; (2) the storage of pictures, images, electronic communications, records and other evidence of the crimes committed; and (3) the devices themselves operate as instrumentalities of the crimes.

35.     Individuals involved in illegal drug distribution conspiracies, related firearms offenses and homicides, and money laundering activities can store information and photographs related to their criminal activities.  These individuals can transfer and store photographs directly to and from phones, tablets, and computers.  These individuals can search for victims over the internet on many of these devices.

36.     As is the case with most digital technology, communications by way of computer, mobile phone, tablet, or other similar electronic media can be saved or stored on the device. Storing such information can be intentional, i.e., by saving an e-mail as a file on a computer or tablet, or saving the location of one's favorite websites such as "bookmarked" or "favorite" files. Digital information can also be retained unintentionally, such as traces of the path of an electronic

communication that may be automatically stored in many places (e.g., temporary files or internet Service Provider client software, among others).

       37.    The forgoing, computer-related items sought to be searched include the following:

       a.    Mobile devices - advances in mobile technology, such as "smart" phones, have made it possible for persons or representatives of businesses and criminal organizations to conduct activities on personal mobile devices, such as telephones, or personal electronic tablet devices, such as an iPad, which are capable of sending electronic communications including electronic mail and electronic "text" messages. These devices also make it possible for an individual to access the Internet to operate email, websites, or store digital and electronic information;

       b.    Electronically Stored Data - Any and all such data concerning the sales of controlled substances and drug paraphernalia, laundering of monetary instruments, engaging in monetary transactions in property derived from specified unlawful activity, and unlawful flight to avoid prosecution. Any and all identification documents and such data consisting of information stored on back-up tapes, computer hard drives, and/or any other form or manner;

       c.    Passwords and Data Security - Computer passwords and other data security devices are designated to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming codes. A password (a string of alphanumeric characters) usually operates as a sort of digital key to "unlock" particular date security devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security

software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

38.     I have been made aware from computer recovery specialists with experience in these matters, that to properly retrieve and analyze all cell phone data, to document and authenticate such data and to prevent the loss of the data either from accidental or deliberate destruction would require laboratory analysis by a qualified specialist.

### REQUEST FOR NIGHTTIME EXECUTION OF SEARCH WARRANT

39.     Due to the nature of the search warrant, the nature of the examination, and the fact that **target device #3** are already in the possession of law enforcement, I am requesting authority to search said items at any time of the day or night, including between the hours of 10:00 p.m. and 6:00 a.m.

### CONCLUSION AND REQEUST FOR SEALING

40.     Based upon the training and experience of the investigative team and the investigation described herein, there is probable cause to conclude that, in the digital media to be searched within the **target device #3**, there will be located evidence of a crime, contraband, the fruit or instrumentalities of a crime, of one or more violations of Title 21, United States Code, §§ 841(a) and 846 (unlawful manufacture, distribution, or possession with intent to distribute a controlled substance and conspiracy), and evidence relative to violations of Title 18, United States Code, §§ 924(c) (possession of a firearm in furtherance of a drug trafficking offense), 1956, and 1957 (money laundering),

41.     Accordingly, I respectfully request the issuance of a warrant to search the target devices described in **ATTACHMENT A** for the records and data described in **ATTACHMENT B.**

42.     In view of the ongoing nature of the investigation, and the risk of harm to informants, cooperating witnesses, to agents, and to the investigation, which would exist should the information in this affidavit be prematurely disclosed, I respectfully request that this affidavit and associated records concerning this search be sealed until further order of the Court.

**I state under the penalty of perjury that the foregoing is true and correct.**

06\04\2020
DATE

James Gaddy
Task Force Officer
Drug Enforcement Administration

**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 this  4th  day of June, 2020.**

*Patricia L. Cohen*

Patricia L. Cohen
United States Magistrate Judge
Eastern District of Missouri

17

## ATTACHMENT A

**Target Device #3,** currently in the custody of the St. Charles County Police Department, within the Eastern District of Missouri, is further described as follows:

**A Multicolored Samsung Model Cellular Device, SM-N975U, IMEI: 359271100750722**



## ATTACHMENT B

1.      All records on target device #3 that relate to violations of Title 21, United States Code (U.S.C.), Section 841(a)(1); unlawful use of a communication facility, in violation of Title 21, U.S.C., Section 843(b); conspiracy and attempt to possess with intent to distribute and to distribute controlled substance, in violation of Title 21 U.S.C., Section 846; felons in possession of firearms and in possession of firearms in furtherance of drug trafficking crimes in violation of Title 18 U.S.C, Sections 922(g) and 924(c); and laundering of monetary instruments, in violation of Title 18, U.S.C., Sections 1956 and 1957 (hereinafter collectively referred to as the "target offenses") that relate to **Guy GOOLSBY** from May 29, 2019 to May 26, 2020 including:

    a.  lists of customers and related identifying information;

    b.  types, amounts, and prices of drugs, chemicals, and precursors trafficked as well as dates, places, and amounts of specific transactions;

    c.  any information related to sources of drugs, chemicals, or precursors (including names, addresses, phone numbers, or any other identifying information);

    d.  any information related to the dates, times, and locations of the distribution and manufacture of controlled substances or the delivery of items used in the distribution and manufacture of controlled substances;

    e.  all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the target devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      All records and other evidence, connection logs, and records of user activity for the target devices, including:

    a.  Connection date and time;

    b.  Disconnect method and time;

    c.  Method of connection (e.g., telnet, ftp, http);

    d.  Date transfer volume;

    e.  User name associated with connection;

    f.  Telephone caller identification records;

    g.  Other connection information, such as:

1)      Any and all telephone numbers, addresses, names or contacts associated with the connection;

2)      Any and all data which might be information from a personal calendar or day planner associated with the connection; and

3)      Any and all data regarding wire or electronic communications, i.e., e-mail, text messages, address books, direct connect numbers, photographs or other images, saved messages including voice and draft messages associated with the connection.

As used above, the terms "records," "information," and "data" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4.      things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.